Matter of Acquiring Title by the CITY OF NEW YORK to Certain Lands and Premises Situated in the Block Bounded by Henry, Harrison, Baltic and Clinton Streets in the Borough of Brooklyn, in the City of New York, Duly Selected as a Site for School Purposes According to Law.

(Supreme Court, Kings Special Term, May, 1918.)

Condemnation proceedings — by city of New York to acquire lands for school purposes — schools — Greater New York Charter — evidence — real property.

Where, in a proceeding brought by the city of New York to acquire title to certain lands as a site for school purposes, it appears that before the case was tried the buildings on said lands were voluntarily destroyed by the city in direct violation of section 1445 of the Greater New York Charter, which requires the trial justice to view the real property to be acquired, the city is precluded from introducing evidence as to the value of such buildings.

MOTIONS by certain property owners that the testimony of the city's witnesses relative to value of buildings on premises be stricken out.

William P. Burr, corporation counsel, John B. Shanahan, assistant corporation counsel, for city.

Meier Steinbrink, for owner of lot 10.

Edward Murphy (Francis P. O'Connor, of counsel), for owners of lots 2, 3, 5, 6, 14 and 18.

George C. Buechner, for owner of lot 44.

A. D. Britton (M. H. Coleman, of counsel), for owner of lot 1.

Supreme Court, May, 1918. [Vol. 103.

Banton Moore (Thomas K. Mahlon), for owner of lot 4.

Henry A. Ingraham (Mr. Hart, of counsel), for owner of lot 7.

Walter J. Carlin, for owner of lot 46.

BENEDICT, J. A preliminary question is raised by the motions of certain property owners that the testimony of the city's witnesses relative to the value of the buildings on the premises acquired in this proceeding be stricken out or disregarded on the ground that the buildings had been razed before the case was brought to trial and hence before the trial justice had an opportunity to view the premises.

Section 1445 of the charter provides in part that, " It shall be the duty of the justice trying any such proceeding, to view the real property to be thereby acquired." An earlier section, 1435, provides in substance that, should he board of estimate and apportionment deem it for the public interest that the property required for any improvement should be acquired at a fixed or specified time, it may direct by a three-fourths vote that title shall vest on the entry of the order granting the application to condemn, or on the filing of the oaths of the commissioners, as the case may be, or upon a specified date after either. In the absence of such action title vests upon the entry of the final decree of the court, or the order confirming the report of the commissioners where the damages are ascertained in that way. It is further provided that upon the vesting of title the city shall immediately take possession of the property. Pursuant to that section the board of estimate did in the instant case pass a resolution directing the vesting in the city of

the title to the premises involved in this proceeding
on June 2, 1917. Thereafter the proceeding came on
for trial by the court without a jury, at the April,
1918, Special Term and was finally heard on April 23,
1918. Prior to that time the buildings which had
formerly stood upon the premises had been entirely
removed, and it had become, therefore, impossible for
the court to comply with the injunction of section 1445
to view the real property to be acquired. The real
property to be acquired necessarily includes both the
land and the buildings erected thereon, because both
are acquired by the city, and the damages are fixed
to comprise the value of both where the whole plot
is acquired. A view of the land only would be a view
of a part only of the real property to be acquired. In
the present case it will be noticed that in every
instance but one the value of the building is greater
than the value of the land on which it stands.

The importance which the courts have accorded to
the view in cases of this kind is indicated by the
remarks of Mr. Presiding Justice Van Brunt in *Matter
of New York Elevated R. R. Co.*, 35 N. Y. St. Repr.
947, where he said as follows:

" We think that commissioners of intelligence can
gain more information in respect to the value of the
property taken by the erection of the railroad from an
inspection than from the evidence of any quantity of
theorists.

" It is a common experience of judicial officers that
expert testimony cannot be relied upon and that it is
entitled to but little weight unless it is supported by
facts established which the court can see tend to sup-
port the theory of the expert, or unless the reasons
given for the conclusion are such as necessarily carry
conviction.

" It is for this reason that an examination of the

situation by the commissioners appointed to assess the damage is so valuable in enabling them to weigh the testimony of the experts who may be examined.''

In a very recent work on eminent domain the author, in treating of the subject of the view, says: '' If there are buildings on the land, the jury should be allowed to examine the buildings in detail, inside and out.'' 2 Nichols Em. Dom. § 434.

If, therefore, section 1435 is to be construed as authorizing the city to acquire title to the premises condemned and remove buildings therefrom before the trial justice has an opportunity to view the premises, that section is obviously in conflict with so much of section 1445 as requires the justice to make the view. Thus we have a statute containing conflicting provisions, and one of them must yield to the other. In determining which shall yield, it may be noted first that, as the provisions contained in section 1445 follow those contained in section 1435, the former is to be regarded as the later expression of the legislative will. It is further to be considered that the provision of section 1445 requiring the justice to view the property is imperative, while the provisions of section 1435 relative to vesting of title are permissive merely. The rule of interpretation applicable to such a conflict is that what is commanded takes precedence of what is merely permitted. Thus in *State ex rel. Bixby* v. *City of St. Louis,* 241 Mo. 231, 250, the court said: '' So, the proviso may be likened in its nature to a *permission,* the rest of the law showing what is *prescribed.* In such case, the rule is: Where what is only permitted is found incompatible with what is prescribed, the latter has the advantage. [Vattel's 36th rule.] ''

The reference is apparently to Vattel's Law of Nations, where the following is given, as the 1st (and

not the 36th) rule for the interpretation of laws and treaties containing conflicting provisions:

"1. *In all cases where what is barely permitted is found incompatible with what is positively prescribed, the latter claims a preference:* for the mere permission imposes no obligation to do or not to do: what is permitted is left to our own option — we are at liberty either to do it or to forbear to do it. But we have not the same liberty with respect to what is prescribed: we are obliged to do that: nor can the bare permission in the former case interfere with the discharge of our obligation in the latter; but, on the contrary, that which was before permitted in general, ceases to be so in this particular instance, where we cannot take advantage of the permission without violating a positive duty." Vattel's Law of Nations, Ingraham's American Edition of Chitty's Translation, p. 271. The original text may be found by reference to p. 215 of "Le Droit des Gens" by M. de Vattel, Leyden, 1757, in book II, chapter 17, section 312.

Applying this rule to the instant case it is obvious that the permissive provisions of section 1435 must yield to the mandatory provisions of section 1445, and that the city has no right to remove the buildings on condemned premises until the trial justice has made · his view.

It is quite true that all formal rules for the interpretation and construction of statutes must yield to the intention of the legislative power, where that can be ascertained. But the application of the rule last above discussed seems to be in entire accord with the legislative intent; for the fact that the provision relative to a view was made mandatory is strong evidence that the legislature regarded it of greater importance, and laid greater stress upon it, than it did the per-

missive provisions relative to the vesting of title prior to the final decree or order.

The city having prematurely removed the buildings, and thus destroyed real or tangible evidence which the trial justice is required to take into consideration in fixing the damages to the property owners, the evidence of the value of the buildings offered on behalf of the city should be stricken out or disregarded. The situation is analogous to that in a case where one who has voluntarily destroyed a document seeks to introduce secondary evidence of its contents. In such a case the rule is that the party offering the parol evidence must " account satisfactorily to the court for having destroyed the paper itself." *West* v. *New York Central & H. R. R. R. Co.,* 55 App. Div. 464, 467. See, also, *Mason* v. *Libbey,* 90 N. Y. 683; *Steele* v. *Lord,* 70 id. 280; *Blade* v. *Noland,* 12 Wend. 173. I do not, of course, intend to charge the city officials with any actual fraudulent intent in destroying the buildings in question. But the fact remains that they were voluntarily and intentionally destroyed in direct violation of the provision of section 1445 of the charter which requires the trial justice to view the real property to be acquired. In my opinion, therefore, the destruction was wrongful in law, and should preclude the city from presenting evidence of the value of the buildings. I have, so far as the land to be acquired is concerned, viewed it and from such view and the evidence submitted in the proceeding have reached the following conclusions in respect of the damage sustained by the several property owners by reason of the acquisition by the city of New York of the real property owned by them respectively, that is to say: Lot No. 1 on the damage map, 431 Henry street, for damage to land $4,380, for damage to buildings $4,275; total $8,655: Lot No. 2, No. 429 Henry street, for damage to land

$2,920, for damage to building $5,500; total $8,420: Lot No. 3, No. 427 Henry street, for damage to land $2,920, for damage to building $5,000; total $7,920: Lot No. 4, No. 425 Henry street, for damage to land $2,920, for damage to building $4,800; total $7,720: Lot No. 5, No. 423 Henry street, damage to land $2,920, for damage to building $5,000; total $7,920: Lot No. 6, No. 421 Henry street, for damage to land $2,800, for damage to building $5,840; total $8,640: Lot No. 7, No. 419 Henry street, for damage to land $2,800, for damage to building $5,000; total $7,800: Lot No. 9, No. 415 Henry street, on consent, for damage to land $2,492, for damage to building $5,108; total $7,600: Lot No. 10, No. 413 Henry street, for damage to land $4,350, for damage to building $10,777.43; total $15,127.43: Lot No. 14, No. 180 Baltic street, for damage to land $3,500, for damage to building $5,850; total $9,350: Lot No. 18, No. 188 Baltic street, for damage to land $3,575, for damage to building $15,200; total $18,775: Lot No. 46, No. 177 Harrison street, for damage to land $3,150, for damage to building $8,400; total $11,550.

Ordered accordingly.